IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LEWIS COMMUNICATIONS, INC.,
    Plaintiff,

vs.                                    Case No: 3:06cv128/WS/EMT

ZOHOURI SEAGORVE, L.P. f/k/a
ZOHOURI DEVELOPMENT SOUTH
WALTON, L.L.P.,
    Defendant.
_____/

## REPORT AND RECOMMENDATION

        This cause is before the court upon Plaintiff's Motion for Summary Judgment (Doc. 42). On January 9, 2007, the deadline for Defendant's response to Plaintiff's motion for summary judgment was extended to February 28, 2007 (Doc. 54 at 1).[1] No response was received from Defendant; therefore, on March 1, 2007, this court ordered Defendant to show cause why Plaintiff's motion for summary judgment should not be granted (*see* Doc. 58 at 1). As of this date, Defendant has failed to respond to the motion for summary judgment.

        Plaintiff, an Alabama corporation, is an advertising and marketing corporation that rendered certain advertising, design, and marketing services and produced advertising and marketing materials

---

[1] In the same order, the court granted counsel for Defendant's motion to withdraw and ordered that Defendant obtain new counsel (Doc. 54 at 1). To date, Defendant has failed to obtain new counsel and to comply with or respond to this court's orders (*see id.*; Doc. 56 at 1 (order to show cause for failure to obtain new counsel)). Indeed, no activity on Defendant's part has occurred since its counsel was permitted to withdraw on January 9, 2007 (*see* docket sheet).

for Defendant (*see* Doc. 43 at 2). Defendant, a Florida limited partnership, is a property developer constructing a multimillion dollar residential community in Walton County, Florida, to be known as Aquatera (*id.*). Plaintiff alleges that Defendant has not paid an outstanding balance of $143,657.78, plus interest, for services Plaintiff performed on Defendant's behalf (*see* Doc. 42 at 11).[2] Plaintiff brought the instant action on the basis of three theories of liability: (1) failure to pay an open account, (2) failure to pay for goods and services, and (3) breach of contract (*see* Doc. 1 at 1–3). Plaintiff now moves for summary judgment on its breach of contract and open account claims (*see* Doc. 42 at 2–5, 10–11). Upon review of the record, the undersigned recommends that Plaintiff's motion be granted in part and denied in part.

I.  BACKGROUND

The following facts are undisputed.[3] On May 19, 2005, Plaintiff executed a contract with Defendant wherein Plaintiff promised to perform certain initial and ongoing advertising, design, and marketing services on Defendant's behalf (the "contract") (*see* Doc. 43, Ex. A at 1, 2). John P. Earles IV, project manager, executed the contract on behalf of Defendant (*see id.*, Ex. A at 5).[4] The contract provides that "[i]n advance of incurring any expenses or making commitments on [Defendant's] behalf, [Plaintiff] agrees to request and secure [Defendant's] approval of estimates for all expenditures . . ." (*id.*, Ex. A at 2). Under the terms of the contract, Plaintiff was to meet with Defendant to develop a marketing plan and to gather background information about Defendant's Aquatera project (*id.*, Ex. A at 1, 5).[5] The contract indicates that Plaintiff's total estimated fee for this

---

[2]The court notes that jurisdiction is proper under 28 U.S.C. § 1332 (2006), as the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

[3]Defendant has failed to respond to Plaintiff's motion for summary judgment. Thus, there is no evidence in support of a factual position other than the position presented by Plaintiff.

[4]Although it is not disputed by Defendant, the court notes that Jose Lora, apparently another one of Defendant's employees, testified during his deposition that Earles was the project director for the Aquatera project and had authority from Defendant to execute this contract on behalf of Defendant (*see* Doc. 43, Attach. 16 at 19:1–8 (Lora Dep., Sept. 28, 2006)).

[5]The contract refers to this meeting as "the DIG" (*see, e.g.*, Doc. 43, Ex. A at 1, 5). The contract states that after this meeting Plaintiff will produce a "strategic planning presentation, which summarizes the research findings and conclusions. As part of this presentation, umbrella recommendations are made and strategies and objectives defined for the development and target audience. The strategy will be modified to take into account feedback gathered in presenting the message, then agreed upon before creative execution begins." (*id.* at 5).

service and to develop a marketing plan was $21,000.00 (*id.*, Ex. A at 2). Next, the contract states that Plaintiff was to design and develop an identity and concept for Defendant including logos, colors, stationery, an "Aquatera Mantra," images for use on promotional materials, sales materials (brochures and direct mail pieces), and a website (*id.*, Ex. A at 1, 2). The contract indicates that the estimated fee for these services was $50,000.00–60,000.00 (*id.*, Ex. A at 2). "This fee covers concept and design only" (*id.*). It does not include any illustrations, original or stock photography, or the costs for the production of any materials (*id.*). The fee includes the building of the initial website, but it does not include website hosting or monthly maintenance fees (*id.*). Regarding production of materials and use of outside services, the contract provides that Defendant shall pay, after pre-approval, all costs for all outside production materials and services purchased by Plaintiff, plus a commission and the net cost of mailing, shipping, telephone, photocopy, and travel expenses (*id.*, Ex. A at 3). Regarding payment, the contract provides that Defendant shall pay Plaintiff's monthly "invoices within 60 days of receipt," and in the event payment is not made within 60 days, Plaintiff "will charge [Defendant] a service fee of 1 – 1/2 % per month on overdue balances" (*id.*, Ex. A at 3–4). Finally, the contract provides that Defendant agrees to pay all legal and outside fees associated with the collection of overdue balances (*id.*, Ex. A at 4).

After the contract was executed, a meeting was held sometime in the spring / summer[6] of 2005 between Plaintiff and Defendant at which Plaintiff was to acquire the information it needed to develop a marketing plan for Defendant (*see id.*, Attach. 15 at 19:5–25 (Earles Dep., Sept. 20, 2006)). Several of Plaintiff's employees attended the meeting (*see id.*, Attach. 15 at 19:14–20 (Earles Dep., Sept. 20, 2006)). Earles and an associate also attended the meeting (*see id.*, Attach. 15 at 19:21–22 (Earles Dep., Sept. 20, 2006)).

On May 31, 2005, handwritten notes on the contract indicate that Plaintiff billed Defendant $14,000.00 for meeting with Defendant and developing a strategic marketing plan (*see id.*, Ex. A at 2). On June 30, 2005, further handwritten notes on the contract indicate that Plaintiff billed Defendant an additional $7,000.00 for meeting with Defendant and developing a strategic marketing plan and $60,000.00 for designing and developing a concept and identity for Defendant (*see id.*).

---

[6]Plaintiff alleges this meeting was held on May 18 and 19, 2005 and was attended by several of Plaintiff's employees, Earles, and Connie Carlberg for Defendant (Doc. 43 at 2 ¶9).

Defendant paid these invoices with two checks: $67,000.00 on September 28, 2005 and $14,000.00 on November 8, 2005 (*see id.*, Ex. F at 1, 2).

On September 12, 2005, upon Plaintiff's request, Earles approved[7] an estimate for a stationery project totaling $14,164.50 and a pocket folders project totaling $18,339.50 (*see id.*, Ex. B at 3).[8] On September 27, 2005, upon Plaintiff's request, Earles approved estimates for several projects including $26,750.00 for illustrations / prospective, $59,800.00 for photography, and $15,475.00 for insert sheets (*id.*, Ex. B at 1, 2, 4).[9] On October 5, 2005, Earles approved an estimate of $40,929.00 for an image book project (*id.*, Ex. B at 5).[10]

In addition to the estimates referenced above, Plaintiff has provided unapproved estimates of $12,250.00 for the CD packaging and origami folder projects and $3,300.00 for the stock image project (*id.*, Ex. C at 1–2).[11] E-mails between Earles and Plaintiff establish that Earles was working to provide Plaintiff with materials to be included in the liner notes portion of the CD packaging project, including a dedication from musician Rick Braun (*see id.*, Ex. D at 1–3). Thus, it appears that Earles was aware of and most likely approved of the CD packaging project. Another e-mail between Earles's associate and Plaintiff indicate that some "stock photos" were approved for use in the stock image project (*see id.*, Ex. D at 5). Thus, it also appears that Defendant was aware of and most likely approved of the stock image project. The evidentiary materials do not reflect that Plaintiff submitted estimates to Defendant for the site signage project. Nevertheless, Plaintiff has

---

[7]Although Defendant has not questioned Earles's authority to approve project estimates on its behalf, the court notes that Lora testified at his deposition that Earles had the authority to "initiate projects and sign the production estimates on behalf of" Defendant (*see* Doc. 43, Attach. 16 at 19:9–12 (Lora Dep., Sept. 20, 2006)).

[8]The estimated price for the stationery and pocket folder projects includes the cost of producing (printing) the stationery and pocket folders (*see* Doc. 43, Ex B at 3).

[9]Where appropriate, the estimated prices include the cost of producing (printing) the relevant project (*see* Doc. 43, Ex. B at 1–4).

[10]Where appropriate, the estimated prices include the cost of producing (printing) the relevant project (*see* Doc. 43, Ex. B at 1–4).

[11]The estimates provided are for design costs only (*see* Doc. 43, Ex. C at 1–2). In addition to the cost of design, production of 1,000 CD packages and origami folders was estimated as $23,400.00 (*id.*, Ex. C at 1). Production of 1,000 brochures using stock images was estimated as $6,400.00, and the one-year usage cost of the stock photos on the website was estimated as $3,900.00 (*id.*, Ex. C at 2).

provided an invoice report showing that it sent Defendant invoices for the site signage project (*see id.*, Ex. E at 1–2).

On December 14, 2005, Nazanin Weck,[12] marketing director for Defendant, e-mailed Plaintiff and Earles to "check to see where we are on this marketing plan" for Aquatera (*see id.*, Ex. G). Weck wrote "I was hoping to get it [(the marketing plan)] this morning, [because] we [(Defendant)] have a meeting at noon to go over the project marketing strategy and I would like to use it for that" (*id.*). On the same day, Plaintiff transmitted a nine-page marketing plan to Defendant (*see id.*, Ex. H at 1–9). The marketing plan was addressed to, among others, Earles, Weck, and Fred Zohouri, President of Defendant corporation (*see id.*, Ex. H at 1). In brief, the marketing plan outlined the Aquatera vision, including a romanticized description of a residential community with the "whimsical charms of the French Antilles [and the] intimation of Colonial Mexico" that invited residents to "[a]rise early and stroll on the boardwalk through the cypress wetlands, glimpsing hummingbirds, gopher tortoises, yellow-striped lizards or even the rare pink flowering black titi" and then slip into a coffee shop or artist's studio for inspiration; the target market (educated, well-traveled, and "accomplished but unpretentious" adults between 35 and 65 with an income between $100,000.00 and $150,000.000); the "collateral" or marketing material, including stationery suite, pocket folders, illustrations and photography, insert sheets, image books, a packaged Aquatera CD, and an origami package; the direct marketing database (designed to track marketing efforts and track sales responses); the website; and the "media mix" or ad-buying plan (*id.*, Ex. H at 2–4). Also included in the marketing plan was an initial budget totaling $631,438.00 (*id.*, Ex. H at 5). The initial budget included $21,000.00 for an initial meeting, research, and the marketing plan ("the DIG") and $60,000.00 for "development [of] identity, collateral and website design" (*id.*). In pertinent part, the initial budget also included the following estimations (*id.*).

| | |
|---|---|
| Stationery suite: | $ 11,164.00 |
| Pocket folders: | $ 18,337.00 |
| Illustrations: | $ 26,750.00 |
| Photography (original): | $ 59,800.00 |

---

[12]Although the details are not exactly clear, Earles testified during his deposition that, at some point in 2005, Weck "took over" a role previously performed by another one of Defendant's employees (*see id.*, Attach. 15 at 37:15–21 (Earles Dep., Sept. 20, 2006)).

Case No.: 3:06cv128/WS/EMT

| | |
|---|---|
| Photography (stock): | $ 3,900.00 |
| Insert sheets (6 homes): | $ 15,475.00 |
| Image books: | $ 40,929.00 |
| CD packaging (design only): | $ 4,975.00 |
| Origami package: | $ 22,632.00 |
| Website (continued work billed hourly): | $ 2,296.00 |
| Site signage (design only): | $ 3,430.00 |

(*id.*). Finally, the marketing plan provided a "project status / rollout" report indicating that the stationery suite and pocket folder projects were awaiting final client approval and would take about two weeks to produce (*id.*). The illustration project was awaiting final architectural and elevation changes and could be produced by the illustrator four to six weeks after the changes were finalized; the report also notes that the insert sheets, image book, and origami projects would be affected by alterations to the illustration project because the illustrations "will go in" the said projects (*id.*). The insert sheets project was awaiting final illustrations and floor plans (*id.*, Ex. H at 6). The image book project was "with client" awaiting approval of the layout and would take about two weeks to print after final approval was given (*id.*). The CD project was awaiting final approval and Earles was to "handle production with Rick Braun's record company" (*id.*). The origami project was on hold (*id.*). The website had been live since September 2005, and an "updated copy" was sent on November 22, 2005 (*id.*). The site signage design was complete and Plaintiff was waiting on a price quote for glass tiles (*id.*). Finally, the marketing plan also included a three-page public relations plan with bullet points outlining strategies, media audiences, objectives, media development and familiarization goals, crisis management, accountability, and budget objectives (*id.*, Ex. H at 7–9).

     On January 11, 2006, Weck drafted a new contract that was to replace all prior agreements between Plaintiff and Defendant (the "draft contract") (*id.*, Ex. I at 1–7). The draft contract was never executed, but it contains information relevant to Plaintiff's claims. In relevant part, the draft contract indicated that Defendant would agree to pay Plaintiff for outstanding expenses totaling $137,546.69 (*id.*, Ex. I at 1). In addition to this amount, the draft contract provided that Defendant would pay an additional $27,500.00 to complete the work started to date, and that payment in full for the entire agreement would be made in three installments of $55,015.57 (*see id.*). The first installment was to be made when the draft contract was executed, with a second payment at the half-way point, and a final installment "upon delivery of all materials and files to" Defendant (*id.*). In the

"scope of work" section, the draft contract addressed existing projects such as the stationery suite (Plaintiff to provide mechanical layout), illustrations (Defendant to facilitate getting necessary illustrations from illustrator to Plaintiff), insert sheets (Plaintiff to provide mechanical layouts for six homes), brochure / pocket folders (Plaintiff to provide mechanical layouts), photography (shoot complete, post-production work to be directed by Plaintiff, proposed fee for third year of usage to be submitted to Defendant by Plaintiff), origami (not expected to be produced, Plaintiff to deliver design files to Defendant), CD packaging (Plaintiff to provide mechanical layout to record company), site signage (no additional work is necessary by Plaintiff, mechanicals and design files to be delivered to Defendant), website development (Plaintiff to complete pages as necessary information is provided by Defendant), and miscellaneous project (Plaintiff to continue to bill Defendant for all outside costs) (*see id.*, Ex. I at 1–3).  In this section, the draft contract also shows that a postcard / mailer project was added with comments indicating that Plaintiff is "to design a simple mailer postcard for direct mail campaign" based on the cover of the existing brochures (*see id.*, Ex. I. at 3).  Under the subheading "compensation," the draft contract indicated that as of December 30, 2005, the amounts listed below were due for the referenced projects (*id.*).

| | |
|---|---|
| Stationery suite: | $ 7,114.35 |
| Pocket folders: | $ 8,470.51 |
| Illustrations: | $ 8,530.29 |
| Photography (original): | $ 61,961.00 |
| Photography (stock): | $ 4,682.21 |
| Insert sheets: | $ 10,567.70 |
| Image books: | $ 20,861.59 |
| CD packaging (design only): | $ 4,356.61 |
| Origami package: | $ 4,180.11 |
| Website development: | $ 2,317.62 |
| Site signage: | $ 4,227.50 |
| Miscellaneous (phone & fax): | $ 277.20 |

(*id.*, Ex. I at 4).  In a "to complete work" column, the draft contract indicated that $8,000.00 was needed to complete the insert sheets project, $7,500.00 to complete the image book project, and $12,000.00 to complete "website development" (*id.*).

On January 12, 2006, an e-mail exchange between Weck and Earles shows that Weck transmitted the draft contract to Earles for his review (*id.*, Ex. J).  On February 3, 2006, an e-mail between Weck and Plaintiff shows that Weck was under the impression that "on the last version of

the contract we were set to go and just needed to clarify that [Plaintiff] had agreed to the 1/3 amount of total invoices down to get the job going then the other 1/3 midway and 1/3 on completion. Fred [Zohouri] is in today and can sign the contract and have the check cut if you let me know" (*id.*, Ex. L). Earles was also copied with the e-mail message to Plaintiff (*id.*). On February 5, 2006, Plaintiff responded and indicated that it did not agree to the three-installment payment plan and "made this change in the contract" and returned it to Defendant for review on January 16, 2006 (*see id.*, Ex. M).

Finally, an undated invoice report covering the period from August 31, 2005 to January 31, 2006, generated by Plaintiff, shows a total outstanding balance due from Defendant of $143,657.78 (*id.*, Ex. E at 2).[13] The charges are listed by month, are broken down by project, and total as follows.

| | |
|---|---|
| Stationery suite: | $ 8,606.47 |
| Pocket folders: | $ 12,228.52 |
| Illustrations: | $ 14,539.66 |
| Photography (original): | $ 61,934.82 |
| Photography (stock): | $ 4,400.97 |
| Insert pages: | $ 12,908.68 |
| Image books: | $ 15,489.13 |
| CD packaging: | $ 4,041.61 |
| Origami package: | $ 3,793.18 |
| Website development: | $ 2,295.74 |
| Site signage: | $ 2,740.00 |
| Miscellaneous (phone & fax): | $ 379.00 |

(*see id.*, Ex. E at 1–2).

---

[13]Plaintiff obtains the amount presently demanded under its breach of contract claim by subtracting the amounts invoiced for the origami project ($3,793.18) and the site signage project ($2,740.00) (*see* Doc. 42 at 2–5; Doc. 43 at 6). Thus, Plaintiff demands $137,124.60 under its breach of contract claim (*see* Doc. 42 at 5). Nevertheless, Plaintiff "believes it is entitled to those amounts [as well] given [Defendant's] acknowledgment of the debt of $137,546.69, which includes the [o]rigami and [s]ite [s]ignage amounts" (Doc. 43 at 7 n.1). Finally, to ensure completeness, the court notes that Plaintiff demands the full invoiced amount of $143,657.78 under its open account claim (*see* Doc. 42 at 11).

Case No.: 3:06cv128/WS/EMT

II.  DISCUSSION

Plaintiff moves for summary judgment on its breach of contract and open account claims (*see* Doc. 42 at 5, 11). Defendant has failed to respond to Plaintiff's motion. Still, the court notes that Defendant filed an amended answer in this case raising several affirmative defenses (*see* Doc. 28 at 3–5). To the extent that they are relevant, the court shall consider the affirmative defenses raised by Defendant.[14]

A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[T]he substantive law will identify which facts are material" and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *See id.*

Even though Defendant has not opposed Plaintiff's motion, Rule 56(c) specifies that summary judgment may be entered only when the record evidence shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law; thus, "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion." United States v. One Piece of Real Property, 363 F.3d 1099, 1101 (11th Cir. 2004). When a motion for summary judgment is unopposed, the court's review of the motion is less searching than it might have been if the motion had been contested. *See id.* "The district court need not sua sponte review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials. . . .

---

[14]The court will not consider any legal or factual arguments that Defendant could have, but has not, asserted in opposition to Plaintiff's motion for summary judgment. *See* Gardner v. First Premium Ins. Group, No. 06-0694-WS-M, 2007 WL 1283999, at *2 (S.D. Ala. Apr. 30, 2007). The law is clear, however, that where a defendant pleads an affirmative defense and plaintiff does not, by affidavit or other sworn evidence, negate or deny that defense, plaintiff is not entitled to summary judgment. Maung v. Nat'l Stamping, LLC, 842 So. 2d 214, 216 (Fla. 3d DCA 2003); *see also* Fasano v. Hicks, 667 So. 2d 1033, 1034 (Fla. 2d DCA 1996) (finding that in absence of some proof contradicting or opposing affirmative defense, entry of summary judgment is improper).

Case No.: 3:06cv128/WS/EMT

At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment." *Id.* at 1101–02.

At the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. *See* Anderson, 477 U.S. at 249, 106 S. Ct. at 2510–11. A genuine issue exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. *See id.* " If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust Co. v. Fidelity and Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

When assessing the sufficiency of the evidence in favor of the nonmoving party, the court must view all the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party." Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993). The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." Anderson, 477 U.S. at 249–50, 106 S. Ct. at 2511. "A mere 'scintilla' of evidence supporting the . . . [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting Anderson, 477 U.S. at 252, 106 S. Ct. at 2512).

B.   Plaintiff's Claims

Plaintiff moves for summary judgment on both its breach of contract and open account claims (*see* Doc. 42 at 5, 11).

1.   Open Account Claim

It is not as easy as it should be to identify what does — or does not — constitute a cause of action for "open account." *See, e.g.*, Cent. Ins. Underwriters, Inc. v. Nat'l Ins. Fin. Co., 599 So. 2d 1371, 1373–74 (Fla. 3d DCA 1992) (per curium); Robert W. Gottfried, Inc. v. Cole, 454 So. 2d 695, 696 (Fla. 4th DCA 1984). An open account is "an unsettled debt arising from items of work and labor, goods sold and delivered with the expectation of further transactions subject to future settlement and adjustment." Cole, 454 So. 2d at 696. An open account "should not include express

contracts or other obligations that have been reduced to writing." H & H Design Builders, Inc. v. Travelers' Indem. Co., 639 So. 2d 697, 700 (Fla. 5th DCA 1994); *see also* Morse, LLC v. United Wis. Life Ins. Co., 356 F. Supp. 2d 1296, 1299–1300 (S.D. Fla. 2005) (citing H & H Design for the proposition that an open account should not include express contracts or other obligations that have been reduced to writing). Usually, the sole record of an open account is the account books of the owner of the demand. H & H Design, 639 So. 2d at 700. "An obligation does not become an 'open account' simply because the amount due under a contract requires calculation. An obligee under a contract cannot avoid the requirement of pleading and proving a cause of action based on a contract by placing its demand on a 'statement of account' and mailing it to the obligor." *Id.*

In this case, it is clear that Plaintiff alleges the existence of an express contract and has shown that it reduced the terms of its project estimates to writing (*see, e.g.*, Doc. 43, Ex. A at 1–5 (contract); *id.*, Ex. B 1–5 (written estimates)). Thus, Plaintiff does not have valid open account claim against Defendant and summary judgment on this claim should be denied.[15] *See* H & H Design, 639 So. 2d at 700; *see also* Morse, 356 F. Supp. 2d at 1299–1300.

---

[15]Plaintiff appears to confuse a cause of action for open account with an action for account stated. "Actions for an account stated and an open account are two distinct causes of actions requiring different burdens of proof." S. Mo. Co. of Dade County v. Accountable Const. Co., 707 So. 2d 909, 912 (Fla. 3d DCA 1998). An account stated claim is " 'an agreement between persons who have had previous transactions, fixing the amount due in respect to such transactions and promising payment.' " *Id.* (quoting Nants v. F.D.I.C., 864 F.Supp. 1211, 1219 (S.D. Fla. 1994)). Thus, for an account stated to exist, there must be an agreement that a certain balance is correct and due, and an express or implicit promise to pay that balance. *Id.* (citing Georges v. Friedman & Co., P.A., 499 So. 2d 59, 59 (Fla. 4th DCA 1986)); *see also* Merrill-Stevens Dry Dock Co. v. Corniche Express, 400 So. 2d 1286, 1286 (Fla. 3d DCA 1981) (explaining that "[f]or an account stated to exist as a matter of law, there must be an agreement between the parties that a certain balance is correct and due and an express or implicit promise to pay this balance."). Plaintiff's summary judgment motion and complaint, however, refer only to a claim for open account (*see* Doc. 1 at 1–2; Doc. 42 at 10–11). Nevertheless, it is not clear from Plaintiff's complaint that it has stated a claim for account stated. In particular, both in Count I of Plaintiff's complaint and in the complaint more generally, Plaintiff does not allege the existence of an agreement fixing the amount due with respect to prior transactions between it and Defendant and a promise, explicit or otherwise, by Defendant to pay the specified balance (*see* Doc. 1 at 1–2 ("Count I—Open Account")). Plaintiff merely states that "the principle sum of $143,657.78 [is] due from . . . Defendant by account" (*id.* at 2 ¶6). Thus, it appears that even if Plaintiff had alleged sufficient facts to bring a claim for account stated, Plaintiff would not be entitled to summary judgment on such a claim because it has not produced evidence precluding a dispute of material fact. Essentially, Defendant alleges that it does not owe the amount demanded and states that it never agreed to pay Plaintiff for any prior transactions (*see* Doc. 28 at 2, 4 (Defendant's amended answer and affirmative defenses)). Accordingly, even if Plaintiff had brought an account stated claim, summary judgment on that claim should be denied.

Case No.: 3:06cv128/WS/EMT

2. Breach of Contract

It is elementary that the elements of a breach of contract action are: "(1) a valid contract; (2) a material breach; and (3) damages." J.J. Gumberg Co. v. Janis Servs., Inc., 847 So. 2d 1048, 1049 (Fla. 4th DCA 2003). The construction of a contract term is ordinarily a question of law so long as the terms used are "unequivocal, clear, undisputed and not subject to conflicting inferences." Campaniello v. Amici P'ship, 832 So. 2d 870, 872 (Fla. 4th DCA 2002). Unless ambiguous, contract language must normally be given its plain and ordinary meaning. Beans v. Chohonis, 740 So. 2d 65, 67 (Fla. 3d DCA 1999); *see also* Vernon v. Resolution Trust Corp., 907 F.2d 1101, 1109 (11th Cir. 1990) (stating that "[u]nder Florida law, when the terms of a contract are unambiguous, the Court is bound to give the language therein its plain and ordinary meaning."). Moreover, "[w]here the determination of the issues of a lawsuit depends upon the construction of a written instrument and the legal effect to be drawn therefrom, the question at issue is essentially one of law only and determinable by entry of summary judgment." Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126, 131 (Fla. 2000) (internal quotations and citations omitted). Where the terms of the contract are clear and unambiguous, summary judgment is appropriate. Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A., 771 So. 2d 628, 631 (Fla. 4th DCA 2000).

Here the contract language is clear and unambiguous and will be given its ordinary and plain meaning. Plaintiff "agrees to render all services customarily performed by a marketing communications agency, including, but not limited to[:] . . . A. Comprehensive strategic planning including communication management and direction. B. Concept and design and any and all creative components for internal and external communications. C. Production and fulfillment supervision. D. Advise and bill [Defendant] for all remittances made by [Plaintiff] for [Defendant's] account . . ." (Doc. 43, Ex. A at 1). "The initial and ongoing work to be performed by [Plaintiff] on [Defendant's] behalf includes, but is not limited to, the following:" reviewing the existing information on Defendant's Aquatera project and summarizing its findings in a presentation with "umbrella recommendations . . . strategies and objectives . . . modified to take into account feedback [from Defendant] . . . then agreed upon before creative execution begins" (*id.*, Ex. A at 5); developing an "identity," including logos, colors, stationery, and a mantra; and overseeing the "concept and design of" visual images (illustrations, etches, etc.), sales materials (brochure(s) and direct mail), and

development of a website (*id.*, Ex. A at 1). The contract also states that "[i]n advance of incurring any expenses or making commitments on [Defendant's] behalf, [Plaintiff] agrees to request and secure [Defendant's] approval of estimates for all expenditures in connection with [Defendant's] marketing communications" (*id.*, Ex. A at 2). "All production of materials will be estimated for [Defendant] and produced only upon approval by [Defendant]" (*id.*).

> All outside production materials and services purchased by [Plaintiff] on [Defendant's] behalf including, but not limited to photography, typography, photostats, engravings, print production, will be estimated by [Plaintiff] and submitted to [Defendant] for pre-approval. [Plaintiff] shall bill [Defendant] per project for [Plaintiff's] time and for [Plaintiff's] cost plus commission (5% of the gross amount billed*) to cover [Plaintiff's] expense of performing specific production and administrative functions.
>
> *After the initial production of materials outlined in this proposal has been executed (i.e., stationery suite, brochure(s), direct mail), [Plaintiff] reserves the right to reevaluate the production commission with [Defendant] to revert back to [sic] industry standard of 15% commission. . . .
>
> [Defendant] agrees to pay the <u>net</u> cost (no [Plaintiff] markup) for all mailing and shipping costs . . . telephone, facsimile and photocopy charges . . .
>
> [] <u>TERMS OF PAYMENT</u>
>
> [Defendant] agrees to pay all [of Plaintiff's] invoices within 60 days of receipt. In the event that payment due to [Plaintiff] is not paid within 60 days, [Plaintiff] will charge a service fee of 1 – 1/2 % per month on overdue balances. Additionally, [Defendant] agrees to pay all legal and outside fees associated with the collection of overdue balances.

(*id.*, Ex. A at 3).

In this case, there is no allegation that the contract is invalid or that Earles did not have the authority to execute the contract on Defendant's behalf. The contract bears Earles's signature, and there is no material dispute as to the validity of the contract (*see* Doc. 43, Ex. A at 4).[16]

---

[16]Defendant's third (no consideration) and fourth (no mutuality) affirmative defenses attempt to attack the validity of the contract (*see* Doc. 28 at 4). Both of these defenses fail. First, Defendant's allegation that the contract fails for lack of consideration is without merit because the contract clearly states that Plaintiff is to render services and produce materials on Defendant's behalf and Defendant is to pay for those services and materials. Defendant's payment was clearly sufficient consideration for Plaintiff's performance. Furthermore, Plaintiff's promise to render services and produce materials and Defendant's promise to pay are alone sufficient consideration to support the parties' agreement. Second, Florida courts have explained that in many cases "the defense of mutuality of obligation [is] nothing more than

The next issue is whether there was a material breach of the contract. *See* J.J. Gumberg, 847 So. 2d at 1049; *see also* Beefy Trail, Inc. v. Beefy King Int'l, Inc., 267 So.2d 853, 857 (Fla. 4th DCA 1972) ("To constitute a vital or material breach a defendant's nonperformance must be such as to go to the essence of the contract; it must be the type of breach that would discharge the injured party from further contractual duty on his part."). Where the payment of a certain amount is dependent upon the occurrence of conditions precedent, payment is not due before satisfaction of those conditions precedent unless their performance is waived or excused by the conduct of the parties. *See, e.g.*, Hamilton v. Title Ins. Agency of Tampa, Inc., 338 So. 2d 569, 571 (Fla. 2d DCA 1976); *see also* RESTATEMENT (SECOND) CONTRACTS § 225(1) (1981) ("Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused."). A condition precedent has been defined as one which calls for the performance of some act, or the happening of some event after a contract is entered into, upon the performance or happening of which its obligation to perform is made to depend. Alvarez v. Rendon, 953 So. 2d 702, 708 (Fla. 5th DCA Apr. 5, 2007) (citing Cohen v. Rothman, 127 So. 2d 143, 147 (Fla. 3d DCA 1961)). " '[T]here must be at least a substantial performance of conditions precedent in order to authorize a recovery as for performance of a contract.' " *Id.* (quoting Cohen, 127 So. 2d at 147)).

Here, the contract required Plaintiff to submit estimates for Defendant's approval; perform marketing and communications functions, including strategic planning, designing, and producing marketing materials; and bill Defendant for its services and materials (*see* Doc. 43, Ex. A at 1–3). Thereafter, the contract requires Defendant to pay Plaintiff's invoices within 60 days of receipt (*see id.*, Ex. A at 3).

There is no dispute that Plaintiff submitted written estimates and Defendant approved the estimates for the stationery, pocket folders, illustration, photography (original), insert sheets, and

---

a smoke screen. . . . [W]here there is no other consideration for a contract, mutual provisions must be binding on both parties, but where there is any other consideration for the contract, mutuality of obligation is not essential." Beach St. Bikes, Inc. v. Bourgett's Bike Works, Inc., 900 So. 2d 697, 700 (Fla. 5th DCA 2005) (internal quotations and citations omitted). Any mutuality defense is precluded by the parties' obligations to render performance and make payment. *See id.*

image book projects (*see* Doc. 43, Ex. B at 1–5).[17] Plaintiff also alleges that it submitted written estimates for the photography (stock), CD packaging, and origami package projects (*see id.*, Ex. C at 1–2). Furthermore, the record shows that Defendant engaged in communications necessary to execute the photography (stock), CD packaging, and origami package projects (*see id.*, Ex. D at 1–3, 5). Defendant has not alleged that it never received or approved estimates for the photography (stock), CD packaging, and origami package projects. In fact, the record shows that Defendant acknowledged Plaintiff's work on the photography (stock), CD packaging, and origami package projects in a draft contract and stated that Plaintiff billed it for amounts consistent with the estimates provided by Plaintiff (*see id.*, Ex. H at 5; *see also id.*, Ex. C at 1–2). Thus, in the absence of a dispute, the court finds that Defendant approved of the photography (stock), CD packaging, and origami package projects. Plaintiff also alleges that estimates were submitted to Defendant for the website development and site signage projects (*see* Doc. 42 at 4). Unlike the other projects, the record does not contain written estimates for the website development and site signage projects. The court notes, however, that Plaintiff's marketing plan includes estimated costs for website development and site signage (*see* Doc. 43, Ex. H at 5). Specifically, the marketing plan indicates that website work was continuing and would be billed hourly, and the site signage project estimation was for design only (*see id.*). "Updating the website will be ongoing as material and information is finalized" (*id.*, Ex. H at 6). In relation to the site signage project, the plan also indicated that Plaintiff was "to provide pricing of glass tiles" to complete production of the project (*id.*). Again, in the draft contract Defendant acknowledged that it was billed by Plaintiff for amounts consistent with the estimates that Plaintiff provided in the marketing plan (*see id.*, Ex. I at 4). Thus, the court finds that Defendant approved of Plaintiff's estimates for the website project and the site signage project. In summary, Defendant approved Plaintiff's estimates for the stationery, pocket folders, illustrations, photography (original), photography (stock), insert sheets, image book, CD packaging, origami package, website development, and site signage projects. Finally, regarding miscellaneous charges,

---

[17]The court notes that the contract itself provides estimates for a strategic planning meeting ("the DIG") and the development "concept and design" for the Aquatera project (*see* Doc. 43, Ex. A at 2). It is undisputed that Defendant paid for these estimates after being billed by Plaintiff (*see id.*, Ex. F at 1–2). Defendant's sixth affirmative defense alleges that it is entitled to recoup the amounts it paid Plaintiff because Plaintiff breached the contract by failing to provide the services for which those payments were tendered (*see* Doc. 28 at 4). The court need not address Defendant's contention because, as will be discussed in further detail below, Defendant materially breached the contract.

Case No.: 3:06cv128/WS/EMT

the contract does not require that Plaintiff obtain Defendant's approval prior to billing it for miscellaneous charges (*see id.*, Ex. A at 3). The contract merely states that Defendant shall pay the net cost of Plaintiff's miscellaneous expenditures (*see id.*). Plaintiff billed Defendant for these charges monthly (*see id.*, Ex. E at 1–2), and Defendant acknowledged that Plaintiff "will continue to bill [Defendant] for all outside costs such as [] telephone, fax charges, travel expenses, etc." and stated that as of January 2006, a certain amount of miscellaneous obligations were due (Doc. 43, Ex. I at 3, 4).

After obtaining Defendant's approval of its estimates, the contract requires Plaintiff to "render services" including concept development, creative design, and production of marketing material (*see id.*, Ex. A at 1). Defendant, in its first, second, and fifth affirmative defenses, essentially alleges that Plaintiff did not satisfy, substantially or otherwise, all of the conditions precedent to trigger Defendant's performance (*see* Doc. 28 at 3–4). Defendant also alleges that the performance of Plaintiff's obligations has not been excused by any event (*see id.*). More specifically, Defendant states that "the contract called for [P]laintiff to complete a marketing plan before incurring the expenses for which [Plaintiff] now seeks compensation . . ." (*id.*). Defendant is mistaken. The contract does not call for Plaintiff to complete and submit a marketing plan to Defendant before incurring any expenses. The contract simply requires Plaintiff to submit to Defendant for pre-approval an estimate of the cost for each project that Plaintiff was to complete. As explained above, Plaintiff has done so; thus, the only remaining issue is whether Plaintiff has performed its obligation to "render services" under the contract.

Plaintiff alleges that it rendered all of the services and produced all of the materials that the contract required it to produce (*see* Doc. 42 at 4, 6–10). Next, Plaintiff states, and the record shows, that Plaintiff billed Defendant for its performance (*see* Doc. 43, Ex. E at 1–2). Defendant has failed to respond to these allegations with any specific argument or statement of fact. Defendant's general assertion that Plaintiff failed to perform its obligations under the contract, fully or substantially, is the only statement that tends to contradict Plaintiff's extensive allegations and factual exhibits which demonstrate that Plaintiff completed or substantially completed the work required by the contract. The court is not obliged to deny Plaintiff's summary judgment motion if the evidence favoring Defendant is "merely colorable or is not significantly probative." <u>Anderson</u>, 477 U.S. at 249–50.

"A mere 'scintilla' of evidence supporting the . . . [Defendant's] position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. Walker, 911 F.2d at 1577 (quoting Anderson, 477 U.S. at 252). Defendant not has submitted even a scintilla of evidence to support its position that Plaintiff failed to "render services" under the contract; in fact, Defendant has not submitted any evidence whatsoever. Furthermore, Defendant has not alleged that Plaintiff failed to bill it for the services rendered. Plaintiff, however, has introduced uncontroverted evidence demonstrating that it rendered the services it promised and billed Defendant for them. For example, Defendant's draft contract reflects its admission that substantial work, $137,546.69 of the $143,657.78 demanded, had already been completed by Plaintiff (*see* Doc. 43, Ex. I at 3, 4). The draft contract also shows that Defendant had knowledge of the amounts billed by Plaintiff (*see id.*, Ex. I at 4). Accordingly, on the basis of the evidence presented, no reasonable dispute of fact exists and no reasonable person could determine that Plaintiff failed to perform its obligations under the contract. Therefore, Plaintiff has performed all of its obligations under the contract, and Defendant's duty to pay for those services has fully matured.

Finally, it is undisputed that Defendant failed to pay Plaintiff for its services and materials. Therefore, Plaintiff has been damaged.

Accordingly, Plaintiff has shown that there is no dispute of material fact regarding Defendant's breach of the contract. *See* J.J. Gumberg, 847 So. 2d at 1049. The Florida courts have explained that, when there is a total breach of contract, Plaintiff may "treat the contract as void and seek those damages which will put him in the same position as he was immediately prior to making the agreement" or "insist on the benefit of his bargain, and seek those damages which will place him in the position he would have been if the contract had been completely performed." McCray v. Murray, 423 So. 2d 559, 561 (Fla. 1st DCA 1982) (internal quotations and citations omitted). "The purpose of damages is to put the injured party in as good a position as he would have occupied had the contract been fully performed. In this context the injured party is considered to be 'affirming' the contract." Beefy Trail, 267 So. 2d at 857.

Here, Plaintiff has elected to sue for damages and has shown that it is entitled to relief in the principle amount of $143,657.78 plus interest at the rate of one-and-a-half (1.5%) percent per month.

The contract also provides that Plaintiff is entitled to attorney's fees and the costs of this action (*see* Doc. 43, Ex. A at 3).

III.   CONCLUSION

Summary judgment should be denied on Plaintiff's open account claim but granted on Plaintiff's breach of contract claim in the amount of $143,657.78, plus interest at the rate of one-and-a-half (1.5 %) percent per month.  Plaintiff is also entitled to reasonable attorney's fees and costs.

Accordingly, it is respectfully **RECOMMENDED**:

1. That Plaintiff's Motion for Summary Judgment (Doc. 42) be **GRANTED in part and DENIED in part**.  Plaintiff's motion should be granted as to its breach of contract claim but denied as to its open account claim.

2. That judgment be entered for Plaintiff against Defendant in the amount of $143,657.78 plus accrued interest at the rate of one-and-a-half (1.5 %) percent per month through the date that judgment is entered.

3. That Plaintiff's counsel be required to submit appropriate supporting documentation to sustain an award of attorneys' fees and costs within **thirty (30)** days from the date an order adopting this report and recommendation is entered.  Further, Plaintiff should calculate the interest that has accrued through the date judgment is entered and submit this figure with its documentation.

At Pensacola, Florida, this 5th day of July 2007.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**